# IN THE COURT OF COMMON PLEAS FOR THE STATE OF DELAWARE
## IN AND FOR NEW CASTLE COUNTY

JARAAD WATSON,              )
                                 )
       Appellant,         )
                                 )
       v.              )     C.A. No: CPU4-21-004447
                                 )
ELIZABETH SULLIVAN,    )
                                 )
       Appellee.        )

Submitted: May 14, 2024
Decided: September 23, 2024

Jaraad Watson
1307 Radford Road
Wilmington, DE 19803
*Self-represented*
*Defendant-Below/ Appellant*

Elizabeth Sullivan
P.O. Box 10771
Wilmington, DE 19850
*Self-represented*
*Plaintiff-Below/ Appellee*

## DECISION AFTER TRIAL

**Danberg, C.J.**

Defendant-Below/Appellant Jaraad Watson brings this appeal *de novo* from a decision of the Justice of the Peace Court dated December 15, 2021, in which judgment was entered in favor of Plaintiff-Below/Appellee Elizabeth Sullivan.[1] This action stems from a furtive rental arrangement between Mr. Watson, the landlord, and Ms. Sullivan, the tenant. In her complaint, Ms. Sullivan seeks to recover for her unreturned security deposit ($1,500), improperly imposed rental charges ($6,350), and other unenumerated harm, totaling $25,000.

A bench trial was held on March 14, 2024,[2] during which the Court heard testimony from Mr. Watson and Ms. Sullivan and received documents into evidence.[3] At the conclusion of trial, the Court reserved decision. This is the Court's Final Decision After Trial.

## FACTS

In 2017, Mr. Watson acquired possession of a property located in Wilmington, Delaware (the "Property"), which he wanted to sell or rent. In July of 2017, Mr.

---

[1]    10 *Del. C.* § 9570.
[2]    This case was intended to be tried on the same day as another matter involving the same parties, *Sullivan v. Watson*, 2023 WL 3487773, Ca. No. CPU4-21-004463. Trial in this case was to proceed first and, for efficiency, the evidence presented would be incorporated in the second case. However, the parties were both self-represented, and the presentation of evidence in this matter took the entire day; so, trial in the second matter was continued to August 13, 2024. While the Court took this matter under advisement at the conclusion of trial on May 14, 2024, it held its decision until the conclusion of the second case, and until decisions could be issued simultaneously.
[3]    Both parties submitted binders of various documents into evidence as Plaintiff's Exhibit 1 and Defendant's Exhibit 1. Plaintiff's Exhibit 2, a payment history printout, was also received into evidence.

Watson was put in contact with Ms. Sullivan by Daryl Stroy, who eventually became his property manager. Ms. Sullivan needed to secure housing by the end of the month, and Mr. Watson agreed to rent the Property to her effective August 1, 2017.

Ms. Sullivan was enrolled in a housing assistance program administered by Wilmington Housing Authority ("WHA"), pursuant to which her rent was largely covered by a housing voucher (the "Voucher Program").[4] However, landlords under the Voucher Program are contractually bound by certain terms and conditions, including provisions pertaining to rental rates. The WHA determines the appropriate rental rate (the "Approved Rate" or "Rate"), and the landlord is prohibited from charging rental fees beyond the Approved Rate.[5] The WHA set Ms. Sullivan's Approved Rate at $1,050 per month. Additionally, the WHA provides eligible individuals with utility reimbursement; in May 2019, the WHA set Ms. Sullivan's utility reimbursement at $77 per month,[6] but that figure was later reduced to $44 per month.[7]

---

[4] Ms. Sullivan explained that the portion of her rent covered by the WHA voucher was issued directly from WHA to Mr. Watson.

[5] In addition to setting the Approved Rate, the WHA assesses what portion of that Rate will be paid by the housing voucher; the portion of rent covered by the voucher is paid directly to the landlord, and the tenant is responsible for any difference between the voucher payment and the Approved Rate. Initially, WHA covered $901 per month, leaving Ms. Sullivan responsible for $149 per month, but it later increased her voucher to cover the entire $1,050 rental obligation.

[6] Pl. Ex. 1 at B-8.2.

[7] Pl. Ex. 1 at B-20 shows that, Ms. Sullivan's utility reimbursement was $44 per month, effective September 1, 2020.

## A. The Property-related Agreements

To rent to Ms. Sullivan through the Voucher Program, Mr. Watson was required to contract with WHA, acceding to WHA's terms and conditions including the $1,050 Approved Rate and the prohibition on rental charges above the Approved Rate.[8] Those terms and conditions were memorialized in the Housing Assistance Payments Contract ("HAP Contract"), which was executed by Mr. Watson and a WHA representative.[9]

In addition to the HAP contract, Ms. Sullivan's rental of the property was governed by a written agreement between the parties in the form of a WHA Model Lease ("Lease One").[10] Lease One depicted the $1,050 monthly rental rate prominently on the first page. It also outlined the parties' responsibilities with regards to utilities, including water; it specified that the landlord (Mr. Watson) would be responsible for "min" water, while the tenant (Ms. Sullivan) would be responsible for "excess" water. While the terms "min" and "excess" were not defined in Lease One, the record indicates that "excess" refers to expenses that exceeded the utility reimbursement set by the WHA.[11] Finally, Lease One specified that Ms. Sullivan

---

[8] Pl. Ex. 1 at A.

[9] *Id.*

[10] *Id.*

[11] Neither party directly confirmed the definition of "min" and "excess." However, documents introduced into evidence by Ms. Sullivan demonstrate that, at the very least, Ms. Sullivan assented to the interpretation that "excess" meant any amount over the utility reimbursement provided by WHA. For example, a Public Housing Authority Annual Reexamination report shows that, for the August 1, 2019 through August 1, 2020 period, Ms. Sullivan was assessed

was to furnish a security deposit in the amount of $1,050.

To execute Lease One, Ms. Sullivan met with Mr. Stroy at his office, at which time she was presented with two identical copies of Lease One. According to Ms. Sullivan, she signed both copies of Lease One; one to be sent to WHA, and one for Mr. Stroy's records. Mr. Stroy likewise signed Lease One in his capacity as Mr. Watson's property manager.

At trial, Mr. Watson also produced an agreement purportedly signed by Ms. Sullivan and Mr. Stroy, which was identical to Lease One except that the monthly rental rate depicted on the first page was $1,200—not $1,050 ("Lease Two").[12]

### B. Ms. Sullivan's Security Deposit and Rental Payments

At the end of July, as she was preparing to move into the Property, Ms. Sullivan met with Mr. Watson and Mr. Stroy to furnish the $1,050 security deposit. Seemingly perplexed, Mr. Watson insisted that the rental rate for the Property was $1,200—not $1,050. Ms. Sullivan testified that, at that stage, she was "stuck"; she did not have time to secure alternative housing, and arrangements had been made for her child's schooling based upon her expectation that they would be living at the

---

a utility reimbursement of $44. During that period, Mr. Stroy sent Ms. Sullivan a picture of a water bill (payment due March 16, 2020) totaling $88.91, along with a message advising that she owes $44. Ms. Sullivan accented without objection. This exchange between Mr. Stroy and Ms. Sullivan is consistent with her paying the excess over her $44 utility reimbursement. Thus, as finder of fact, the Court is satisfied that the term "excess" meant water bills in excess of Ms. Sullivan's utility reimbursement rate.

[12] Def. Ex. 1.

Property. Believing she had no other option, Ms. Sullivan acquiesced to Mr. Watson's demand for $1,200 monthly rental payments, and she furnished a money order of $1,500 to Mr. Stroy for her security deposit.[13]

From August 2017 through March 2019, Mr. Watson received $1,200 per month in rent for the Property. The $150 difference between the Approved Rate ($1,050) and the amount charged ($1,200) (the "Overage Charge") was typically paid in cash to Mr. Watson via Mr. Stroy. In April 2019, the rental rate was increased to $1,300, but the payment structure remained the same; the $250 monthly Overage Charge was generally paid in cash to Mr. Watson via Mr. Stroy. Ms. Sullivan testified that, in all, she paid $6,350 in Overage Charges, the sum of $150 per month for 19 months plus $250 per month for 14 months.[14]

### C. Ms. Sullivan's Tenancy and Vacating of the Property

Ms. Sullivan testified that, in addition to the monthly rental overage payments, she incurred various expenses due to Mr. Watson's dilatory maintenance of the property (the "Property-Related Expenses"). She paid $100 for the installation of

---

[13] The memo line specifies that the money order was for Elizabeth Sullivan's security deposit. Pl. Ex. 1-A.

[14] Ms. Sullivan testified that she paid $150 per month in Overage Charges from August 2017 through March 2019, which calculates to 20 months total. She also testified that she paid $250 Overage Charges from April 2019 through June 2020, which calculates to 15 months total. However, in her Complaint and throughout trial, Ms. Sullivan asserted that her Overage Charges claim was for 19 months at $150 per month ($2,850) plus 14 months at $250 per month ($3,500). As such, the Court will consider Ms. Sullivan's claim for Overage Charges as $6,350, consistent with her pleadings and her testimony presented at trial.

fire detectors, which were required for the house to pass inspection, and $15 to replace a toilet seat.[15] When Mr. Stroy failed to resolve a rodent infestation issue, Ms. Sullivan incurred $300 in extermination expenses. Additionally, Ms. Sullivan described paying $400 for a P.O. Box she began renting towards the end of her tenancy, which she maintained for approximately four years.[16] Ms. Sullivan also testified that she was improperly required to pay water bills totaling $407.[17]

In November 2017, the hot water heater exploded which, Ms. Sullivan claimed, caused damage to her personal property to the tune of $3,000. She did not specify the items damaged or the value of the items damage, nor did she otherwise provide a basis for her calculation of damages; rather, Ms. Sullivan merely testified that she suffered "$3,000 in damages due to the mold, mildew and water that consistently came through the basement that damaged all of my property . . . that couldn't be replaced so I had to get rid of that." Ms. Sullivan also incurred expenses in the amount of $25 for special pickup of the damaged water heater.

---

[15] Ms. Sullivan testified that she paid $30 for the toilet seat replacement but was reimbursed for only 50% of the expense.

[16] When asked how the expenses related to Mr. Watson, Ms. Sullivan stated "because had none of this have happened, I wouldn't't've accrued any of these fees."

[17] Ms. Sullivan referred to a receipt for payment dated February 7, 2020, which shows that she paid $87 for "water bill." However, she did not point to the corresponding water invoice her payment was intended to cover, and she did not otherwise demonstrate that the $87 payment improperly encompassed the "min" which, per Lease One, was the landlord's responsibility. Further, Ms. Sullivan did not account for the remaining $320 of her claim for water bill payments; she did not identify the dates, amount, or form of any water bill payments beyond the $87 receipt.

When the COVID-19 pandemic hit, Ms. Sullivan was no longer able to pay the Overage Charges, and the relationship between the parties quickly devolved. In December 2020, Mr. Stroy filed an action in JP Court for back rent and summary possession; however, the matter was dismissed.

Thereafter, in April of 2021, Ms. Sullivan provided Mr. Watson with a written 60-day notice of her intent to vacate the Property by the end of June 2021. As promised, Ms. Sullivan did vacate the Property on June 30, 2021. Commencing the following day, she sent multiple written communications to Mr. Watson demanding the return of her security deposit, to no avail. Later, Mr. Watson contacted Ms. Sullivan explaining that her security deposit had been used.[18]

Ms. Sullivan also testified as to expenses sustained as a result of, and subsequent to, her vacating the Property (the "Moving-Related Expenses"). She asserted that she incurred moving expenses of $3,000, although she did not delineate the nature of the expenses or provided a basis for her calculation thereof. She also testified that she was temporarily removed from the Voucher Program because she was unable to timely secure new housing and, although she was eventually

---

[18] At trial, Ms. Sullivan testified to a letter she received from Mr. Watson regarding the disposition of her security deposit. However, the letter was not included in the binder of exhibits originally submitted to the Court. The record reflects that, during trial, a copy of the letter was made and presented to the Court. However, the record does not suggest that the letter was formally admitted into evidence, and a copy of said letter is not in the Court's possession. Regardless, the Court finds Ms. Sullivan's testimony as to the letter to be credible.

8

reinstated, she was unable to secure permanent housing.[19] She claimed that, because of her lack of permanent housing, she was required to rent a storage unit, the cost of which totaled $11,029.06. Also, because the electric account was not timely transferred to the subsequent tenant, Ms. Sullivan was charged $15.25 for electric expenses incurred by the new tenant.

## PARTIES' POSITIONS

It is Ms. Sullivan's position that Mr. Watson is liable for $6,350 in wrongfully imposed Overage Charges, $3,000 in double damages for her unreturned security deposit, $3,862.25 for the Property-Related Expenses, and $14,029.06 for the Moving-Related Expenses.

Mr. Watson does not dispute that he received rental payments of $1,200 to $1,300 over the course of Ms. Sullivan's tenancy, but he claims to have had no knowledge of the $1,050 rate set forth in Lease One or the $1,050 Approved Rate and prohibition on overage charging in the HAP Contract. He argues that the parties agreed to the $1,200 rental rate at the outset. Regarding the security deposit, Mr. Watson notes that the $1,500 money order for the deposit was made to Mr. Stroy, and he maintains that he never received the deposit nor was he aware of its existence. As to the property damaged by the water heater explosion, Mr. Watson argued that "most of" the property in the basement when the water heater exploded belonged to

---

[19] Ms. Sullivan testified that she has remained unhoused since she vacated the Property.

his mother—not Ms. Sullivan. Mr. Watson raised no argument as to the remaining Property-Related Expenses or the Moving-Related Expenses.

## DISCUSSION

The Court notes that the parties both proceeded *pro se* and the claims and defenses they raised were not pled or presented with the clarity expected of a law-trained practitioner. While not bound by "every strained interpretation of the allegations proposed by the plaintiff," the Court, in its discretion, afforded considerable latitude to both parties in their pleadings and presentation of evidence at trial.[20]

At first blush, Ms. Sullivan's claims against Mr. Watson seem to be strictly derived from a written agreement between the parties. However, although masquerading as a straightforward breach of contract case, Ms. Sullivan's claims are convoluted by the fact that neither party acted above reproach in this rental arrangement.

### I. Ms. Sullivan's Claim for Overcharge Payments

Two rental agreements were present at trial: Lease One and Lease Two. Although both were purportedly signed by the parties on the same date, they cannot

---

[20] *Mikkilineni v. PayPal, Inc.*, 2021 WL 2763903, at *5 (Del. Super. July 1, 2021)(quoting *Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del. 2001)); *Lechliter v. Del. Dept. of Natural Resources*, 2016 WL 878121, at *2 (Del. Ch. March 8, 2016).

both apply as they contain conflicting price terms.[21] Therefore, the Court must determine which agreement controls and whether that agreement encompasses the entirety of the parties' landlord-tenant dealings.

Ms. Sullivan acknowledges that she signed two rental agreements but explained that she did so because two copies were needed—one for Mr. Stroy and one for WHA. Ms. Sullivan maintained that the agreements she executed were identical copies of Lease One, meaning both executed documents depicted $1,050 as the monthly rental rate—a rate consistent with the Approved Rate set forth in the HAP Contract. Notably, Mr. Watson does not deny the existence of Lease One, but maintains that he was never in possession of Lease One, as evidenced by the fact that his name and address are incorrect as written. Rather, he insists that Lease Two is the sole agreement submitted to him, and he insists that he was wholly unaware of Lease One and the rate provisions of the HAP Contract because Mr. Stroy "was keeping all the records." Simply put, Mr. Watson's theory of the case is that Mr. Stroy and Ms. Sullivan conspired together to commit fraud; however, the victim and beneficiary of the fraud remains unclear, since it resulted in Ms. Sullivan paying $6,350 above what she was legally required to pay.

The Court finds Mr. Watson's theory of the case untenable from a factual

---

[21] For clarity, both Lease One and Lease Two were signed by Mr. Stroy, not Mr. Watson—however, Mr. Stroy signed in his capacity as property manager for Mr. Watson.

11

standpoint. As stated above, the Court is hard pressed to find a benefit inuring to Ms. Sullivan from her alleged fraud. Moreover, Mr. Watson's portrayal of himself as an innocent victim in this fraudulent scheme cannot survive a review of the evidence, which establishes that Mr. Watson knew or was required to know that the rental agreement was capped at the $1,050 Approved Rate. The Court finds Mr. Watson's claim that he was unaware of the Approved Rate to be disingenuous at best. The Approved Rate was communicated to Mr. Watson on numerous occasions, including the HAP Contract that was signed by Mr. Watson himself. The fact that Mr. Watson did not retain a copy of that agreement does not release him from his contractual obligations thereunder. Further, the Approved Rate was re-communicated in correspondence provided to Mr. Watson by the WHA midway through Ms. Sullivan's tenancy. Finally, Mr. Watson lacks any factual basis to challenge Ms. Sullivan's testimony that the agreements she signed were identical in all respects, including the price term, because Mr. Watson was not present when the agreements were signed. As such, the Court finds that Lease One constitutes the written agreement between the parties.

Having found that Lease One is controlling, the Court must consider what impact, if any, the parties' years-long dealings outside of the terms of Lease One have on Ms. Sullivan's ability to recover for the Overcharge Payments. In other words, did Ms. Sullivan's assent to pay Overage Charges obfuscate her right to

12

recover for breach of contract?

Delaware law generally permits oral modification of written agreements.[22] Indeed, the evidence adduced at trial indicates an agreement to pay rent beyond $1,050. Ms. Sullivan made Overage Charge payments with no record of objection for the first 33 months of her tenancy, stopping only when the COVID-19 pandemic rendered her financially unable to keep up with the payments. By her own testimony, she was aware of the prohibition against paying beyond the Approved Rate and, while her initial willingness to pay Overage Charges may have been attributable to Mr. Watson's coercive conduct and her urgent housing need, it cannot be said that she paid the Overage Charges under duress for the entire 33-month period.[23] However, the Court is hesitant to enforce an oral modification of a written contract under these circumstances, where enforcement would render one party unjustly enriched to the detriment of the other party.

While a claim for unjust enrichment is typically available only in the absence of a binding contract, Delaware courts permit recovery for unjust enrichment "if '[t]he contract itself is not necessarily the measure of [the] plaintiff's right where the claim is premised on an allegation that the contract arose from wrongdoing (such as

---

[22] *Reeder v. Sanford School, Inc.*, 397 A.2d 139, 141 (Del. Super. 1979).

[23] Even if the oral agreement was entered under duress, it would have been ratified by Ms. Sullivan's continued assent. *See Standard General L.P. v. Charney*, 2017 WL 6498063, at *16 (Del. Super. Dec. 19, 2017)("Delaware Courts have noted that a party may ratify a contract it agreed to in duress by accepting the benefits flowing from it or failing to challenge it for any considerable length of time").

breach of fiduciary duty or fraud) or mistake and the [defendant] has been unjustly enriched by the benefits flowing from the contract.'"[24] That is precisely the circumstance here—by oral agreement, Mr. Watson fraudulently imposed Overage Charges, despite the WHA's unequivocal prohibition on such charges, resulting in benefit to Mr. Watson and at Ms. Sullivan's expense. Therefore, the Court will consider whether Ms. Sullivan may recover the Overage Charges on an unjust enrichment theory.

"Unjust enrichment is 'the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience.'"[25] To prevail on a claim for unjust enrichment under Delaware law, the Plaintiff must prove, by a preponderance of the evidence: "(1) an enrichment; (2) an impoverishment; (3) a relation between the enrichment and the impoverishment; [and] (4) the absence of justification."[26]

Indeed, with regards to the Overage Charges, Ms. Sullivan has satisfied her burden of proof. By all accounts, Mr. Watson was enriched—and Ms. Sullivan was

---

[24] *Talkdesk, Inc. v. DM Trans, LLC*, 2024 WL 2799307, at *11 (Del. Super. May 31, 2024)(quoting *LVI Grp. Invs., LLC v. NCM Grp. Hldgs., LLC*, 2018 WL 1559936, at *16 (Del. Ch. Mar. 28, 2018)).

[25] *In re Verizon Ins. Coverage Appeals*, 222 A.3d 566, 577 (Del. 2019) (citing *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010)).

[26] *State ex rel. Jennings v. Monsanto Company*, 299 A.3d 372, at 390 (explaining that, traditionally, an unjust enrichment claim requires a showing that no adequate remedy exists at law, but "unjust enrichment is historically a legal, not an equitable, claim" thus "absence of an adequate remedy at law is required only if an unjust enrichment claim is brought in the Court of Chancery and there is no other independent basis for equitable jurisdiction").

impoverished—by the Overage Charges. She demonstrated that the Overage Charges were contrary to the terms of the Voucher Program and were imposed without justification. Therefore, the Court finds that Ms. Sullivan is entitled to recovery of the Overage Charges in the amount of $6,350.

## II. Ms. Sullivan's Claim for the Security Deposit

Ms. Sullivan seeks double damages for Mr. Watson's failure to timely return her security deposit or an itemized list of damages and costs of repair as required under 25 *Del. C.* § 5514. The record reflects that Ms. Sullivan tendered a $1,500 money order dated July 26, 2017, for her security deposit. Mr. Watson denies having ever received a security deposit from Ms. Sullivan, emphasizing that the money order was made payable to Mr. Stroy. Mr. Watson also questions the purpose of the money order, as the amount of the money order ($1,500) differed from the Approved Rate ($1,050) and the actual rent rate ($1,200).

The Court finds Mr. Watson's argument unpersuasive. The memo line of the money order clearly states that it was for Ms. Sullivan's security deposit. Although it was made payable to Mr. Stroy, Mr. Watson's own testimony established that Mr. Stroy acted as his agent, regularly receiving Property-related payments on his behalf. Moreover, while Ms. Sullivan admitted into evidence multiple communications from herself to Mr. Watson demanding return of the security deposit, there is a notable absence in the record of any communications from Mr. Watson denying the

15

existence of such security deposit. Finally, the Court finds credible Ms. Sullivan's testimony that Mr. Watson later reached out with an explanation as to how the security deposit was used. Therefore, the Court finds that, under 25 *Del. C.* § 5514(g)(2), Ms. Sullivan is entitled to damages in the amount of $3,000, which represents double the amount of her security deposit.

### III. Ms. Sullivan's Claim for Property-Related Expenses

Ms. Sullivan testified that she incurred the following expenses related to her tenancy of the Property:

- Installation of fire detectors - $100

- Toilet seat replacement - $15

- Special pickup of water heater - $25

- Extermination expenses - $300

- Water bills - $407

- Personal property damage - $3,000

- P.O. Box rental - $400

Ms. Sullivan's claims for Property-Related Expenses are contractually derived.[27] To prevail on a breach of contract claim, the plaintiff must prove, by a preponderance of the evidence: (1) the existence of a valid and enforceable contract;

---

[27] *See NPC Intern., Inc. v. Rehoboth Mall Ltd. Partnership*, 2007 WL 2473323, at *3 (Del. Super. July 19, 2007)("In Delaware, the rights and remedies of landlords and tenants are governed by contract law principles").

16

(2) that the defendant breached a contractual obligation thereunder; and (3) as a result, plaintiff suffered damages.[28]

The Court finds that Ms. Sullivan has satisfied her burden of proof with respect to the installation of fire detectors, toilet seat replacement, special pickup of water heater, and extermination expenses. As discussed above, Ms. Sullivan demonstrated that the controlling agreement between the parties is Lease One.[29] Notably, Mr. Watson did not contest these expenses, and the Court is satisfied that such expenses were Mr. Watson's obligation under Lease One.[30] Further, Ms. Sullivan proved, by a preponderance of the evidence, the damages she suffered as to each expense. As such, the Court finds that Ms. Sullivan is entitled to damages in the amount of $440 for these expenses.

Unlike the fire extinguishers, toilet seat, specialty pickup, and extermination expenses, Mr. Watson did contest Ms. Sullivan's allegations regarding the water bills and damage to her personal property. As to the water bills, the Court finds that Ms. Sullivan failed to demonstrate that her payment of water bills constituted a

---

[28] *Braga Investment & Advisory, LLC v. Yenni Income Opportunities Fund I, L.P.*, 2020 WL 3042236, at *7 (Del. Ch. June 8, 2020); *VLIW Techn., LLC v. Hewlett Packard Co.*, 840 A.2d 606, 612 (Del. 2012).

[29] While the Court finds that the parties orally modified the price term set forth in Lease One, neither party suggested that the remaining terms of Lease One were modified.

[30] Lease One provides, in relevant part, that Mr. Watson "shall maintain the [Property], equipment . . . and facilities, to provide the decent, safe and sanitary housing" and "shall respond in a reasonable time to calls by the tenant for services to maintain the dwelling unit." Further, Lease One provides that Mr. Watson "shall provide Extermination services as conditions may require."

breach of the parties' agreement. Lease One provided that Ms. Sullivan would be responsible for any "excess" water bills. Thus, to demonstrate a breach, Ms. Sullivan must establish that her water bill payments were not the "excess" contemplated by the Lease. Ms. Sullivan failed to make such showing.[31]

Regarding her claim for damage to personal property, Ms. Sullivan failed satisfy her burden of proof as to damages. At trial, Ms. Sullivan estimated the damage to her property totaled $3,000. However, she did not describe what property was damaged, much less the bases for her valuation of the damaged property. Since these damages were not proven beyond mere speculation, the Court finds that Ms. Sullivan has not satisfied her burden of proof and no damages are awarded for property damage claim.

Similarly, Ms. Sullivan failed to provide any legal basis for her $400 claim for expenses incurred in renting a P.O. Box. Therefore, no damages are awarded for the P.O. Box Rental.

---

[31] Ms. Sullivan referred to the $87 water bill receipt as the sole proof that she improperly paid water bills. However, she did not point to the corresponding water invoice her $87 payment was intended to cover, and she did not otherwise demonstrate that the $87 payment improperly encompassed the "min" which, per Lease One, was the landlord's responsibility. Moreover, even if the $87 payment fell within the "min" and thus was Mr. Watson's obligation—a conclusion the Court cannot reach based on the evidence presented—Ms. Sullivan did not account for the remaining $320 of her claim for water bill payments; she did not identify the dates or amounts of any water bill payments beyond the $87 receipt.

## IV.  Ms. Sullivan's Claim for Moving-Related Related Expenses

Ms. Sullivan points to three moving-related expenses incurred: the July 2021 electric expense, moving expenses, and storage expenses. As to the July 2021 electric expense, Ms. Sullivan demonstrated that she incurred a charge of $15.25 for use of electricity in July 2021, after she had already vacated the premises. Therefore, the Court finds that Ms. Sullivan is entitled to $15.25 for the July 2021 electric expense.

As to the remaining expenses, Ms. Sullivan argues that she is entitled to recover $3,000 for moving expenses, and $11,029.06 for storage expenses. However, although a summary possession action was filed in the Justice of the Peace Court in December of 2020, that action was ultimately dismissed. By her own testimony, Ms. Sullivan left on her own volition. It is clear, the landlord-tenant relationship had deteriorated to the point of litigation involving acrimonious exchanges. It is also clear Mr. Watson had voiced his intention to force Ms. Sullivan's ouster; however, his legal maneuvering had failed. Ms. Sullivan had prevailed. Only thereafter did she notify Mr. Watson in writing of her intent to vacate the premises by June 30, 2021. Ms. Sullivan has not provided any legal basis to support her claim for expenses incurred as a result of her decision to vacate the premises. Therefore, no damages are awarded for the moving and storage expenses.

## CONCLUSION

For the foregoing reasons, **judgment is hereby entered in favor of Ms. Sullivan and against Mr. Watson in the amount of $9,805.25**, which represents $6,350 for Overcharge Payments, $3,000 for double the amount of the security deposit, and $440 for Property-Related Expenses, and $15.25 for July 2021 electric expenses.

The Honorable Carl C. Danberg,
Chief Judge